### UNITED STATES of America, Plaintiff-Appellee,

v.

### COLUMBUS MUNICIPAL SEPARATE SCHOOL DISTRICT et al., Defendants-Appellants.

No. 76–3781.

United States Court of Appeals, Fifth Circuit.

Aug. 9, 1977.

---

Shields Sims, Columbus, Miss., for Columbus Mun. Sep. School Dist.

William G. Burgin, Jr., Columbus, Miss., for Lowndes County School Dist.

Jeremiah Glassman, U. S. Dept. of Justice, Civil Rights Div., Alexander C. Ross, Atty., Jerris Leonard, Asst. Atty. Gen., Ross Connealy, Atty., Brian K. Landsberg, C. J. Calnan, Ben Krage, Attys., Dept. of Justice, Washington, D. C., H. M. Ray, U. S. Atty., Oxford, Miss., for plaintiff-appellee.

Before GOLDBERG, CLARK and RONEY, Circuit Judges.

GOLDBERG, Circuit Judge:

In this school case we review the district court's order desegregating several elementary schools in Columbus, Mississippi. The area of disagreement between the parties is narrow. Appellant School District concedes that the current elementary student assignment pattern is invalid but asserts that the district court went too far in adopting a remedy pairing three sets of schools. The District seeks implementation of an alternative plan that would achieve less desegregation. We conclude that the district court exhibited appropriate sensitivity to the important interests on both sides of the issue, reasonably rejected the District's alternative plan, and conscientiously performed its constitutional duty. We affirm.

I.

Columbus is a small city in northeastern Mississippi having almost equal numbers of black and white students. Prior to 1970 its schools were overwhelmingly segregated.[1] The United States brought this action in July 1970 seeking to remedy that situation. See 42 U.S.C. § 2000c–6. In August 1970 the district court entered a consent decree desegregating the junior and senior high schools.[2]

The United States returned to court in July 1975 seeking relief with respect to the elementary schools. Half the district's ten elementary schools were racially identifiable, and none approached the district's even

---

1. Pursuant to official policy antedating *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Columbus schools were completely segregated until 1965. Before 1970 no white attended any traditionally black school, and less than 5% of the system's blacks attended traditionally white schools.

2. The decree assigned all seventh graders to a single school and all eighth graders to another. It established geographic attendance zones for the two high schools giving each an almost even mix of black and white students.

balance between blacks and whites.[3] Hughes, by far the district's largest elementary school, was 100% black and gravely overcrowded. Coleman, Mitchell, and Union, the other traditionally black elementary schools, remained predominantly black.[4] Two-thirds of the district's black elementary students attended identifiably black schools. Sale and Brandon, on the other hand, were identifiably white, having white populations of 99.0 and 93.2%.

The School District originally opposed modification of the consent decree, arguing that the existing desegregation met constitutional requirements.[5] The district court rejected that position, emphasizing that half the elementary schools were effectively segregated. The lawsuit's focus then shifted to the formulation of a remedy.

The District came forward with two similar proposals, referred to by the parties as Plans A and B, using attendance zone changes. The district court originally approved these proposals but later concluded they were constitutionally inadequate. The District had advanced no other alternatives, and the court accepted the government's suggestion of pairing.[6] Consistently with the government's recommendations, the court ordered the District to establish three pairings, one involving each of the most heavily segregated black schools, Hughes, Coleman and Mitchell.[7]

■ On this appeal the District no longer contends that further relief is unwarranted.[8] Conceding that the elementary schools must be desegregated, the District's sole contention is that its Plan B should have been adopted rather than the government's more extensive pairing plan.[9] It is to that narrow issue that we now turn.[10]

## II.

■ There can be no doubt that Columbus's systemwide constitutional violation

3. These figures and those throughout this opinion exclude Barrow Elementary, a school devoted exclusively to special education.

4. Coleman and Mitchell were overwhelmingly black, having black populations of 91.5 and 92.5% respectively. Union's black population was 71.7%, and for purposes of this opinion we do not count it as racially identifiable. Union's whites, however, were primarily from nearby Columbus Air Force Base, which was not within the geographic boundaries of the Columbus Municipal Separate School District. Excluding air base students, Union was 98.3% black.

5. The District did seek to modify the order by altering high school attendance zones. The court approved the modification without objection from the government. The District also sought to transfer 200 Hughes students to Hunt, which houses all seventh graders, in order to alleviate the acknowledged overcrowding at Hughes.

6. Two schools are paired by combining their attendance zones and assigning each school only certain grades. In the system proposed here, two formerly 1–6 schools would be paired, one taking grades 1–3 and the other grades 4–6.

7. The court originally specified the pairings but later, without objection from the government, withdrew its order and substituted a District proposal utilizing three alternative pairings and amending various attendance zones.

8. By agreeing to the consent decree in 1970 the District conceded a constitutional violation, and, as the District now acknowledges, adequate relief has not yet been afforded. Thus further relief is appropriate. See e. g., *United States v. Seminole County School District*, 553 F.2d 992 (5th Cir. 1977); *Ellis v. Board of Public Instruction*, 465 F.2d 878 (5th Cir. 1972) cert. denied, 410 U.S. 966, 93 S.Ct. 1438, 35 L.Ed.2d 700 (1973) (Ellis II).

9. Plan B would achieve greater desegregation than Plan A, and the District now relies on Plan B.

10. The government challenges our jurisdiction of this appeal, asserting that the notice of appeal was untimely under our decision in *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211, 1222 (5th Cir.) (en banc), rev'd on other grounds, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970). Appellants filed their notice of appeal more than one month after the judge's original pairing order but only five days after the amended pairing order adopting the plan now before us. See note 7 supra. The notice purported to appeal both orders. The appeal is undoubtedly timely with respect to the later order, and all issues in the case are properly presented on review of that order. We therefore deny the government's motion to dismiss the appeal.

called for systemwide relief. As the Supreme Court has repeatedly emphasized, the nature and extent of the constitutional violation must determine the scope of the remedy. *See, e. g., Milliken v. Bradley*, 418 U.S. 717, 744, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (*Milliken I*); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). When there has been "a systemwide impact" courts must fashion "a systemwide remedy." *See Dayton Board of Education v. Brinkman*, —— U.S. ——, ——, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977).

The district court's task was therefore to fashion a remedy eliminating the systemwide violation "root and branch." *See Keyes v. School District No. 1*, 413 U.S. 189, 213, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), *quoting Green v. County School Board*, 391 U.S. 430, 438, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). The court could not, of course, blind itself to interests other than those served by achieving complete desegregation. Its mandate was to formulate an effective remedy while simultaneously considering the interests of local authorities in "managing their own affairs, consistent with the Constitution" and the decree's "burdensome effects" on the children and the educational process. *Milliken v. Bradley*, —— U.S. ——, —— & n. 15, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) (*Milliken II*). The overriding goal, however, was "to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation." *Davis v. Board of School Commissioners*, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971).[11]

■ The district court's application of these principles was beyond reproach. The parties narrowed the remedial alternatives to two: pairing and Plan B. In light of the proposals' effects on desegregation and the other implicated interests, we uphold the district court's choice of pairing.

Pairing promises far greater desegregation, bringing every school in the district within a relatively narrow range of the racial composition of the district as a whole. Under Plan B, in contrast, only three of the ten elementary schools would have black populations falling within twenty percentage points of the systemwide figure of 53%. The black populations in the four traditionally black schools would vary from 74% to 82%. The black populations in three traditionally white schools would vary from 22% to 26%.[12]

These figures, moreover, provide a misleadingly optimistic view of the degree of desegregation that Plan B would achieve. Although the overall black enrollment at Hughes Elementary would be reduced from the present 100% to the more promising level of 82%, grades one through four at

---

11. The School District cites Justice Powell's concurrence in *Austin Independent School District v. United States*, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1977). Justice Powell, speaking for only two other justices, said that "large-scale busing is permissible only where the evidence supports a finding that the extent of integration sought to be achieved by busing would have existed had the authorities fulfilled their constitutional obligations in the past." *Id.* 97 S.Ct. at 519. Justice Powell's brief concurrence did not attempt a comprehensive statement of the standard he envisioned. He did not question the validity of such earlier decisions as *Swann*, and his concurrence was presumably fully consistent with them. Those cases, moreover, have been reaffirmed in *Dayton* and *Milliken II*, cases more recent than *Austin*. We thus adhere to the principles recounted in the text.

At any rate, while we cannot say with assurance where people would have lived, where schools would have been located, and how much integration would have obtained absent the long standing constitutional violation—indeed, no court will ever be able to do so in any school case—we have no reason to suppose that the schools of Columbus would have been less desegregated than they will be under the pairing plan. Housing patterns would not have resulted in strict segregation, and as the District stipulated, "the availability of quality education is a factor which people consider when making the decision of whether to buy a home in a particular area."

12. We do not, of course treat such statistics as independently controlling. The Supreme Court has made clear that racial ratios provide a useful point of departure for analyzing various plans but are not to be used as rigid barriers. *See Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 22–25, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

Hughes would remain virtually 100% black. Plan B would substantially integrate grades five and six, thus improving the school's overall ratios, but would not noticeably affect the lower grades. Similarly, Union Elementary would become virtually all black for grades five and six.[13]

In sum, pairing clearly will achieve much greater desegregation than Plan B. That conclusion alone does not end our inquiry; there are other interests at stake. The desegregation disparity between the plans is substantial, however, and the pairing plan would therefore be preferred absent a showing of important other advantages attributable to Plan B.

Plan B concededly has virtues pairing lacks. By adhering more closely to the neighborhood school concept, Plan B allows more students to walk to school. Busing, however, was a tool of this and other educational systems long before desegregation became an issue, and many Columbus students will ride buses regardless of the choice between pairing and Plan B. The burden students will bear as a result of the pairing proposal's increase in busing, with routes of less than half an hour for any student,[14] pales in comparison to the interests in attending schools free of racial discrimination. Similarly, the added expense of pairing, small in terms of the District's budget, does not provide a persuasive justification for the substantial desegregation losses that Plan B would occasion.[15] Finally, the district court found, and the School District does not contest, that traffic does not constitute a significant problem.[16]

One additional factor counsels approval of the district court's choice of pairing. Plan B raises substantial questions concerning the fairness of its distribution of the burdens arising from desegregation. The district court noted this problem generally, and some members of the Bi-Racial Committee[17] noted specifically that Plan B placed a disproportionate burden on students from the Columbus Air Force Base. No white students other than those from the air base would attend Hughes Elementary, the heretofore all black school that has concededly been severely overcrowded. And air base students, unlike any others in the system, would be required to change schools at the end of the fourth grade.

Reconciling the various interests implicated in any school desegregation case is no easy task. No formula exists for solving the trade off between the level of desegregation and the burdens imposed upon a school district and its students. In the case at bar, pairing achieves much greater desegregation than does Plan B, and it does so without posing intolerable burdens. The district court, showing great sensitivity to the delicacy of its task, chose pairing. The Constitution demands no less. The judgment is

AFFIRMED.

---

**13.** The grade disparities would result from Plan B's transfer of Columbus Air Force Base students from Union to Hughes at the end of fourth grade.

**14.** Under the court's original pairings, travel time between the paired schools would have been 14, 17 and 22 minutes respectively, one-way including loading and unloading. Under the alternative pairings ultimately adopted at the School District's behest, the corresponding times would be 8, 17 and 26 minutes.

**15.** The maximum marginal expense of pairing would be $135,000 per year. The District's annual school budget is nearly $7,000,000.

**16.** Pairing also forces students to change schools after third grade. Though that is undoubtedly an undesirable effect, its importance is mitigated by the fact that students retain their same classmates despite the change of schools. Moreover, the District's own Plan B would force air base students to transfer after fourth grade. *See* note 13 *supra.*

**17.** The court established the Bi-Racial Committee to aid in the desegregation process.