No. 76–200.  AUSTIN INDEPENDENT SCHOOL DISTRICT *v.* UNITED STATES.  C. A. 5th Cir.  Certiorari granted, judgment vacated, and case remanded for reconsideration in light of *Washington* v. *Davis,* 426 U. S. 229 (1976).  MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL dissent because they are persuaded that the Court of Appeals correctly interpreted

and applied the relevant decisions of this Court. ▮▮▮▮▮▮

Mr. Justice Powell, with whom The Chief Justice and Mr. Justice Rehnquist join, concurring.

I concur in the action of the Court, and agree that there would be no need to address the issue of remedy if the Court of Appeals upon reconsideration of its opinion in light of *Washington* v. *Davis,* 426 U. S. 229 (1976), should conclude that there was no constitutional violation. I would nonetheless include the issue of remedy in the remand order because of what appears to be a misapplication of a core principle of desegregation cases. In such cases, this Court has repeatedly emphasized:

> "[T]he task is to correct, by a balancing of the individual and collective interests, 'the condition that offends the Constitution.' A federal remedial power may be exercised 'only on the basis of a constitutional violation' and, '[a]s with any equity case, the nature of the violation determines the scope of the remedy.' " *Milliken* v. *Bradley,* 418 U. S. 717, 738 (1974), quoting *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 16 (1971).

As suggested by this Court's remand premised upon *Washington* v. *Davis, supra,* the Court of Appeals may have erred by a readiness to impute to school officials a segregative intent far more pervasive than the evidence justified.[1] That

---

[1] Although in an earlier stage in this case other findings were made which evidenced segregative intent, see, *e. g., United States* v. *Texas Education Agency,* 467 F. 2d 848, 864–869 (CA5 1972) (actions by school authorities contributing to segregation of Mexican-American students), the opinion below apparently gave controlling effect to the use of neighborhood schools:

"At least in the Texas schools, where we have held that Mexican-American students are entitled to the same benefits of *Brown* [v. *Board of Education,* 347 U. S. 483 (1954),] as are blacks, school authorities may not

court also seems to have erred in ordering a desegregation plan far exceeding in scope any identifiable violations of constitutional rights.

As is true in most of our larger cities with substantial minority populations, Austin has residential areas in which certain racial and ethnic groups predominate in the population. Residential segregation creates significant problems for school officials who seek to achieve a nonsegregated school district. In Austin those problems are perhaps accentuated by the geography of the city. Acknowledging these difficulties, the Court of Appeals noted:

> " 'Countless efforts by school officials, consultants, and visiting teams have found it impossible to produce significant desegregation by boundary line changes, contiguous pairing of schools, magnet schools, or other effective means short of massive crosstown busing incident to noncontiguous pairing of . . . schools. . . .' " *United States* v. *Texas Education Agency,* 532 F. 2d 380, 394 (CA5 1976).

The Court of Appeals then concluded that nothing short of extensive cross-town transportation would suffice.

Designed to achieve a degree of racial balance in *every* school in Austin,[2] the desegregation plan endorsed by the

---

constitutionally use a neighborhood assignment policy that creates segregated schools in a district with ethnically segregated residential patterns. A segregated school system is the foreseeable and inevitable result of such an assignment policy. When this policy is used, we may infer that the school authorities have acted with segregative intent." 532 F. 2d 380, 392 (CA5 1976).

[2] Apparently misconceiving the import of language in *Green* v. *County School Board,* 391 U. S. 430, 442 (1968), to the effect that there should be no "Negro" school or "white" school, the Court of Appeals seems to believe every school must be racially balanced to some degree. *Green* involved a rural, sparsely populated county with only two schools. Much of its language is irrelevant to a large urban school system. Moreover, the effect of applying the language of *Green* to such a system may be

Court of Appeals is remarkably sweeping. For kindergarten through eighth grade, the plan requires crosstown busing of all students in schools that are over 50% minority or 90% "Anglo." [3] For kindergarten through fourth grade, the students in East Austin attending the relevant schools will be bused through the congested center of the city to West Austin. For fifth through eighth grade, the flow will be reversed. The high schools will be integrated by a system of "feeder" schools. This plan requiring transportation of from 18,600 to 25,000 students, consisting of from 32% to 42% of the entire school population,[4] was ordered despite

to stigmatize—without justification—schools that can be identified as having a racial or ethnic majority. The Solicitor General, speaking for the United States in this case, commented that "there is nothing inherently inferior about all-black schools, any more than all-white schools are inferior, when the separation is not caused by state action." Brief for United States 8 n. 5.

[3] This "triggering" condition of the plan requires further comment. Describing it, the Court of Appeals stated as follows:

"Elementary and junior high schools that are between 50 and 90 percent Anglo are defined as 'naturally desegregated' and would remain unchanged. *When changing demographic patterns cause any of these schools to fall outside of the 'naturally desegregated' range, the schools would be brought within the Finger Plan 4-4-4 system.*" 532 F. 2d, at 395 (emphasis added).

This aspect of the plan clearly reveals that the plan is designed to achieve some predetermined racial and ethnic balance in the schools rather than to remedy the constitutional violations committed by the school authorities. As described by the Court of Appeals, the plan is impermissible under our holding in *Pasadena Bd. of Education* v. *Spangler*, 427 U. S. 424 (1976).

[4] In defending the high percentage of children proposed to be bused in Austin, the Court of Appeals relied on superficially comparable percentages of children that were to be transported under the plan approved in *Swann*. The school district before the Court in *Swann* included Mecklenburg County as well as the city of Charlotte. As the Court said: "The area is large—550 square miles—spanning roughly 22 miles east-west and 36 miles north-south." 402 U. S., at 6. Although it included a metropolitan area, much of the district was rural, requiring the trans-

the District Court's conclusion that such a plan would involve a " 'risk to health and probable impingement of the educational process' . . . for students younger than the sixth grade . . . ." App. to Pet. for Cert. 53.

Whether the Austin school authorities intentionally discriminated against minorities or simply failed to fulfill affirmative obligations to eliminate segregation, see *Keyes v. School Dist. No. 1, Denver, Colo.*, 413 U. S. 189, 217 (1973) (POWELL, J., concurring in part and dissenting in part), the remedy ordered appears to exceed that necessary to eliminate the effect of any official acts or omissions. The Court of Appeals did not find and there is no evidence in the record available to us to suggest that, absent those constitutional violations, the Austin school system would have been integrated to the extent contemplated by the plan. If the Court of Appeals believed that this remedy was coextensive with the constitutional violations, it adopted a view of the constitutional obligations of a school board far exceeding anything required by this Court.

The principal cause of racial and ethnic imbalance in urban public schools across the country—North and South—is the imbalance in residential patterns. Such residential patterns are typically beyond the control of school authorities. For example, discrimination in housing—whether public or private—cannot be attributed to school authorities. Economic pressures and voluntary preferences [5] are the primary determinants of residential patterns.

I do not suggest that transportation of pupils is never a

---

portation of pupils quite apart from desegregative efforts. Because of this situation in *Swann*, it is unduly simplistic to compare the percentages of children bused. The situation in Austin is simply not comparable.

[5] See *Keyes*, 413 U. S., at 224–253 (POWELL, J., concurring in part and dissenting in part). The tendency of citizens of common national or ethnic origins to form homogeneous residential patterns in our cities is a familiar demographic characteristic of this country.

permissible means of implementing desegregation.[6] I merely emphasize the limitation repeatedly expressed by this Court that the extent of an equitable remedy is determined by and may not properly exceed the effect of the constitutional violation. Thus, large-scale busing is permissible only where the evidence supports a finding that the extent of integration sought to be achieved by busing would have existed had the school authorities fulfilled their constitutional obligations in the past. Such a standard is remedial rather than punitive, and would rarely result in the widespread busing of elementary-age children.[7] A remedy simply is not equitable if it is disproportionate to the wrong.

---

[6] See *id.,* at 242–252.

[7] A related equitable principle, also applicable in fashioning a desegregation remedy, is that a court has the duty to "balanc[e] . . . the individual and collective interests." *Milliken* v. *Bradley,* 418 U. S., at 738. The individual interests at issue here are as personal and important as any in our society. They relate to the family, and to the concern of parents for the welfare and education of their children—especially those of tender age. Families share these interests wholly without regard to race, ethnic origin, or economic status. It also is to be remembered, in granting equitable relief, that a desegregation decree is unique in that its burden falls not upon the officials or private interests responsible for the offending action but, rather, upon innocent children and parents.