THOMASVILLE BRANCH OF the NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE et al., Plaintiffs-Appellants,

v.

THOMAS COUNTY, GEORGIA, et al., Defendants-Appellees.

No. 77–1196.

United States Court of Appeals, Fifth Circuit.

March 29, 1978.

258

David F. Walbert, Atlanta, Ga., Herbert E. Phipps, Albany, Ga., for plaintiffs-appellants.

Ronald A. Cohen, A. J. Whitehurst, Thomasville, Ga., for defendants-appellees.

Before WISDOM, SIMPSON and TJOFLAT, Circuit Judges.

PER CURIAM:

This is the fourth of four consolidated voting dilution cases we decide today. *See Nevett v. Sides (Nevett II)*, 571 F.2d 209, 213 n. 1 (5th Cir. 1978). Appellants filed this action on August 11, 1975, to challenge the at-large method of electing county commissioners in Thomas County, Georgia. They make two distinct allegations. The first is that the at-large feature of the commission elections works to dilute the votes of blacks in the county (who constitute 35.4% of the voting population) in violation of the fourteenth and fifteenth amendments to the Constitution and of 42 U.S.C. §§ 1971(a), 1973, 1981, and 1983 (1970). The second is that the subdistricts within the county, from which the commission candidates are required to run, are of excessively disparate populations in violation of these same constitutional and statutory provisions. *See generally Dallas County v. Reese*, 421 U.S. 477, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975), *rev'g* 505 F.2d 879 (5th Cir. 1974).

After interrogatories, depositions, and the introduction of documentary evidence, both appellants and appellees moved for summary judgment. The court denied both motions on November 12, 1976. The case went to trial on December 1, 1976, at which additional evidence was received on appellants' prayer for injunctive relief. On December 29, the court dismissed the appellants' complaint.[1] Judgment was entered for the appellees on January 4, 1977.

The district court based its dismissal upon the failure of the appellants to introduce evidence that the 1898 legislation establishing the at-large plan, 1898 Ga.Laws p. 378, was enacted with racially discriminatory motives. Appellants contend that the district court erred as a matter of law in dismissing their complaint on this basis. We agree and therefore reverse the judgment below and remand for further proceedings.

The district court interpreted the Supreme Court decision of *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), as requiring plaintiffs in dilution cases to show discriminatory intent in the enactment of the districting plan being attacked. We squarely reject this interpretation today in *Nevett II; Bolden v. City of Mobile*, 571 F.2d 238 (5th Cir. 1978); and *Blacks United for Lasting Leadership, Inc. v. City of Shreveport*, 571 F.2d 248 (5th Cir. 1978). In *Nevett II* we discuss fully the import of *Washington v. Davis* and other Supreme Court decisions requiring a showing of intentional discrimination in fourteenth and fifteenth amendment cases. We think it unnecessary to restate that

---

1. The district court's opinion is appended to this opinion.

discussion here, except to note that the district court must address the issue whether the districting plan is being maintained with the purpose of diluting the black vote in Thomas County. In its inquiry on remand, the court should employ the multi-factor analysis expounded in *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir. 1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), and explicated in our opinions in *Nevett II, Bolden,* and *Shreveport.* We therefore REVERSE the judgment of the court and REMAND the case for further proceedings consistent with this opinion.

REVERSED and REMANDED.

## APPENDIX

### The Opinion of the District Court
### OPINION AND ORDER

By this action Plaintiffs challenge the constitutionality of at-large elections for members of the Board of Commissioners of Thomas County, Georgia.[1] The present system of electing the Commissioners was established by Act of the Georgia General Assembly in 1898 and has not been modified in any significant respect since that time. Under the applicable law eight Commissioners are elected by a countywide vote and each Commissioner must satisfy a residency requirement. Two members come from the Thomasville District, two from the Boston-Metcalf District, one from the Ochlochnee District, one from the Pavo-Ways-Barwick District, one from the Coolidge-Merrillville-Ellabelle District and one from the Meigs District. The terms of office are staggered so that certain Commissioners stand for election in alternate elections. Ga.L.1898, p. 378, Ga.L.1911, p. 501, Ga.L.1917, p. 394.

This is the second time this Court has dealt with an attack on the system of election of Commissioners in Thomas County. In 1966 a group of white citizens contended that the system resulted in invidious dis-

crimination because of their residence, diluting the voting strength of citizens in the most populous district. This Court determined that this was not an adequate basis for a constitutional attack and the Court of Appeals for the Fifth Circuit affirmed, *Davis v. Thomas County, Georgia, et al.,* 380 F.2d 93 (1967). In the case now under consideration a group of black citizens contend that the system results in invidious discrimination against them because of their race, diluting their voting strength and making it difficult for them to participate meaningfully in the election process. As a remedy the Plaintiffs seek a court-ordered realignment of the County into single-member districts with direction that each district elect one resident of that district to the Board and that only the voters of that particular district be authorized to vote on the candidates from that district.

The Plaintiffs here do not contend that they are denied the right to vote or offer themselves as candidates for office and otherwise participate in the political process. They contend that because they are the minority race in the County they are not likely to succeed in electing blacks to office in an at-large election and they anticipate that if the realignment plan which they urge is put into effect they will be successful because some of the districts would have a black majority population. They contend that it is not necessary for them to show that the at-large system was established with a purpose of discrimination or that its authors were motivated by racial considerations.

The Defendants contend that the fact that an election system may have a disproportionate racial impact because of racial residence patterns is not sufficient to sustain a constitutional attack on the system. They contend that a presumption of racial discrimination is unwarranted, that the Plaintiffs must claim and prove a discriminatory purpose in the establishment of the system. They also contend that it should

---

1. The Board manages the business affairs of the County, being empowered to levy taxes for county purposes and having general supervision over the maintenance of roads, bridges and other county property.

not be the policy of the law to guarantee any candidate or identifiable group a seat in any governmental body.

At the time an evidentiary hearing was held the Plaintiffs introduced evidence intended to demonstrate that the at-large election system which has been in effect since 1898 has a racially disproportionate impact in 1976 and they urge that this situation in and of itself would authorize this Court to direct that another system be adopted. It seems to be clear, however, that such a view is contrary to the teachings of recent decisions by the Supreme Court of the United States. In the case of *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Court said:

> "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race. It is also true that the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). But our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact.

. . . . .

> "*Wright v. Rockefeller,* 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), upheld a New York congressional apportionment statute against claims that district lines had been racially gerrymandered. The challenged districts were made up predominantly of whites or of minority races, and their boundaries were irregularly drawn. The challengers did not prevail because they failed to prove that the New York legislature 'was either motivated by racial considerations or in fact drew the districts on racial lines'; the plaintiffs had not shown that the statute 'was the product of a state contrivance to segregate on the basis of race or place of

origin.' 376 U.S. at 56, 58, 84 S.Ct. 603, 11 L.Ed.2d 512. The dissenters were in agreement that the issue was whether the 'boundaries . . . were purposefully drawn on racial lines.' 376 U.S. at 67, 84 S.Ct. 603, 11 L.Ed.2d 512.

> "The school desegregation cases have also adhered to the basic equal protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose. That there are both predominantly black and predominantly white schools in a community is not alone violative of the Equal Protection Clause. The essential element of de jure segregation is 'a current condition of segregation resulting from intentional state action . . . the differentiating factor between de jure segregation and so-called de facto segregation . . . is *purpose* or *intent* to segregate.' *Keyes v. School District No. 1,* 413 U.S. 189, 205, 208, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). See also id., at 199, 211, 213, 93 S.Ct. 2686, 37 L.Ed.2d 548. The Court has also recently rejected allegations of racial discrimination based solely on the statistically disproportionate racial impact of various provisions of the Social Security Act because 'the acceptance of appellant's constitutional theory would render suspect each difference in treatment among the grant classes, however lacking the racial motivation and however rational the treatment might be.' *Jefferson v. Hackney,* 406 U.S. 535, 548, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972). And compare *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), with *James v. Valtierra,* 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971).

. . . . .

> "Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. . . . Nevertheless, we have not held that a law, neutral on its face and serving ends otherwise within the

power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule, *McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964), that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations.

In its opinion the Court then notes that there have been some decisions by some of the Courts of Appeals that have held that the substantially disproportionate racial impact of a statute standing alone and without regard to discriminatory purposes suffices to prove racial discrimination. With regard to these decisions the Court says:

> "The cases impressively demonstrate that there is another side to the issue; but, with all due respect, to the extent that those cases rested on or expressed the view that proof of discriminatory racial purpose is unnecessary in making out an equal protection violation, we are in disagreement.

> .    .    .    .    .

> "A rule that a statute designed to serve neutral ends is nevertheless invalid, absent compelling justification, if in practice it benefits or burdens one race more than another would be far reaching and would raise serious questions about, and perhaps invalidate, a whole range of tax, welfare, public service, regulatory, and licensing statutes that may be more burdensome to the poor and to the average black than to the more affluent white.

> "Given that rule, such consequences would perhaps be likely to follow. However, in our view, extension of the rule beyond those areas where it is already applicable by reason of statute, such as in the field of public employment, should await legislative prescription."

The principle thus enunciated that a statute such as is here involved is not subject to constitutional attack unless it appears that there was a racially discriminatory purpose in its enactment has been recently reaffirmed by the Supreme Court in *Austin Independent School District v. United States*, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976).

Thus, instead of being of no importance, the question of discriminatory purpose is of prime importance. It is a threshold consideration, and since the Plaintiffs offered no evidence, direct or circumstantial, which would justify a conclusion that a discriminatory purpose prompted the establishment of the election system under attack, it would be useless and improper for us to analyze the secondary evidence which was presented. The house cannot be searched until the threshold is crossed, and racial discrimination in 1898 cannot be presumed from results in 1976.

An examination of the pertinent legislative Acts shows that in 1873 the Georgia General Assembly provided that a Board of Commissioners should be established in Thomas County and that its first members would be appointed by the Governor of the State and that thereafter any vacancies on the Board would be filled by appointment by the Judge of the Superior Court of the County. Then by the Act of 1898 it was provided that instead of being appointed the Commissioners would thereafter be elected by the people "at the same time and in the same way as other county officers are elected". In 1911 the number of Commissioners was increased from five to seven and districts and residency requirements were established "to distribute representation upon said Board territorially in said county". Finally, in 1917 one additional district was created and the number of Commissioners was increased from seven to eight, and that is the system as it exists today. In no way does this history intimate any racial motivation and the Plaintiffs' complaint does not allege and the Plaintiffs' evidence does not suggest that it does.

For the reason which is apparent from the foregoing discussion, the Court determines that the Plaintiffs cannot prevail in

this action. Accordingly, the prayers of the complaint are denied and it is ordered that the complaint be and the same is hereby dismissed.

This the 29th day of December, 1976.

/s/ J. Robert Elliott.
United States District
Judge

WISDOM, Circuit Judge, specially concurring:

I concur specially for the reasons stated in my concurring opinion in *Nevett v. Sides (Nevett II)*, 571 F.2d 209, with which this case is consolidated.