Walter MOSELY, Rev. C. O. Hall, William Land and Willie Lewis, Jr.

v.

Bernis W. SADLER, Maurice Conerly, Arthur J. Guidry, Joe L. James, Malcolm L. Clerk, C. Fred Huber and Ray Bernard.

Civ. A. No. B–78–69–CA.

United States District Court, E. D. Texas, Beaumont Division.

April 11, 1979.

564

Donald J. Floyd, Kermit C. Morrison, Jr., Port Arthur, Tex., for plaintiffs.

Robert Q. Keith, Mehaffy, Weber, Keith & Gonsoulin, Beaumont, Tex., George B. Wikoff, Port Arthur, Tex., for defendants.

Robert P. Walker, Port Arthur, Tex., for intervenors.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

STEGER, District Judge.

### FINDINGS OF FACT

In accordance with the mandate of *Nevett v. Sides*, 571 F.2d 209, 217 (5th Cir. 1978) and the cases decided therewith and cited therein, the Court, having heard and considered the evidence, makes the following "particularized determinations" relevant to an ultimate decision in this case.

### GENERAL FACTS

I. *HISTORICAL*:

1. The City of Port Arthur was founded in 1898.

2. It is located in Southeast Jefferson County, Texas.

3. Port Arthur is bounded by Lake Sabine, the Sabine-Neches waterway, and is near to the Gulf of Mexico and the salt-grass marshland adjacent to the Gulf of Mexico.

4. Port Arthur encompasses an area of 50.38 square miles of land area and 32.57 miles of water area.

5. Port Arthur is largely an industrial city whose people predominantly work in oil refining, petro-chemical manufacturing, sea-faring, and related occupations.

6. Two of the nation's largest oil refining and petro-chemical manufacturing facilities are located at Port Arthur.

## II. *POPULATION FACTS*:

7. The population of Port Arthur has been:

    (a) 1940 _____ 46,140
    (b) 1950 _____ 57,530
    (c) 1960 _____ 66,676
    (d) 1970 _____ 57,371

8. Port Arthur has a somewhat heterogeneous population predominantly consisting of Mexican-Americans, Negroes, Caucasians, and among this group, a large influence of French-speaking "Cajuns" who have come largely from South Louisiana to work in the oil refining and petrochemical industries but who have a distinct cultural background and ethnic character.

9. The heterogeneous population of Port Arthur is very different from the population of East Texas cities to the north wherein the white populous is normally Anglo-Saxon Protestant.

10. The population of Port Arthur is different from the south Texas cities wherein there is a large dominance of Mexican-American citizens.

11. Because of the Louisiana "Cajun" influence, Port Arthur has a large Roman Catholic population.

12. Port Arthur has a large percentage of older (62 or older) persons and retired persons. The 1970 census reflects 8,032 older persons, or 14% of the total population, compared to a national average of approximately 10%.

13. The racial composition of Port Arthur, according to the 1970 census, is:

    (a) Total population _____ 57,371
    (b) Total Black population \_\_\_\_ 22,994 \_\_ 40.00%
    (c) Total Hispanic population \_\_ 3,799 \_\_ 6.62%
    (d) Total voting-age population _____ 37,856 \_\_ 66.00%

## GOVERNMENTAL FACTS AND POLICIES

## III. *PREVIOUS GOVERNMENTAL FORMS*

14. Texas allows its cities to operate under a "home-rule amendment" which provides:

"Cities of more than 5,000 inhabitants may by a majority vote of the qualified voters adopt their own Charter; . . ." Texas Constitution, Article XI, § 5.

15. Port Arthur adopted the home-rule amendment on March 8, 1932.

16. From 1898 until 1955 Port Arthur elected its city governmental officials by at-large vote.

17. From 1955 until 1962 Port Arthur elected its city governmental officials from wards or single-member districts.

18. From 1963 until the present Port Arthur elects its mayor and city council members in at-large elections.

19. The city council members must reside within residential subdistricts and are voted at large.

## IV. *CHARTER CHANGE*:

20. Between 1955 and 1962 Port Arthur elected its city council members in and from single-member districts. Only those persons residing within the ward or single-member district voted on the council member from such district.

21. Port Arthur, during the time 1955 till 1962, became infamous for its corruption in local government.

22. The citizens of Port Arthur formed a charter-change commission in 1962.

23. The citizens of Port Arthur concluded that much of its local governmental corruption was attributable to the ward or single-member district form of election.

24. In January, 1963, the present city charter was adopted by vote of the people.

25. The results of that charter-change election were: For, 6,829; against, 1,022.

26. The charter-change election of January, 1963 was supported by Black and White citizens alike and the vote carried favorably to charter change in every single voting box, both Black and White. The change from the use of single-member districts to the use of a multi-member districting scheme was rooted in a strong state policy allowing certain municipalities to choose their form of governance and the adoption of the multi-member districting by the City of Port Arthur was reasonably related to the desire of the citizens of Port Arthur, both Black and White, to eliminate the much publicized corruption in city government under the single member plan.

## V. *PRESENT CITY CHARTER :*

27. Port Arthur operates under a council-manager form of government.

28. The council-manager form of government has generally been considered in the United States as the most enlightened and efficient type of local government.

29. In Port Arthur, city council members must serve the interests of the entire city, and not merely those in the ward or district of their residence.

30. The council-manager form of government calls for a mayor and city council elected by the general population and a professional city manager to operate the city and carry out the policies of the city council.

31. The city council in Port Arthur consists of six (6) council persons and a mayor.

32. Each elected official serves a term of two (2) years.

33. Each person is elected in an at-large vote.

34. Each of the six city council members must reside in a geographical subdistrict but are voted on by the entire electorate.

35. There is no filing fee for city council office.

36. The Charter calls for property ownership as a condition of qualification to the office of mayor or city council.

37. The City Attorney of Port Arthur has declared the property ownership requirements for candidacy unconstitutional and unenforceable.

38. No person has been excluded from candidacy or disqualified for lack of property ownership under the present city charter.

39. There are no provisions for primary elections under the present city charter.

40. All persons elected as mayor and city council persons have been chosen in non-partisan elections.

41. Each person elected must receive a majority vote, and there is a run-off provision to accommodate this requirement.

42. There is no "anti-single-shot" provision in the city charter.

43. The Charter may be changed by election of a majority of persons voting.

44. A charter-change election must be called upon petition of 5% of the total number of persons voting at the last general election of the city.

45. 14,443 persons voted at the last general election of the city.

46. Neither plaintiffs nor anyone else has petitioned to amend the present City Charter, although a petition of only 721 persons is required to call an election to amend the Charter.

*ACCESSIBILITY*

VI. *BLACK POLITICAL HISTORY*:

47. The experience of the Negro citizen chronicled in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314, has not been the experience in Port Arthur.

48. While Blacks in Texas were generally excluded from participation in the Democratic Party primaries prior to World War II (cf. *Nixon v. Herndon*, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 [1927]), Blacks have participated fully in political elections in Port Arthur.

49. Beginning at least as early as 1921, Blacks have participated without discrimination in all municipal elections within the City of Port Arthur.

50. In 1927 a separate voting box was created at the Grannis Avenue Fire Station, within a Black residential area.

51. While in most cities of Texas Blacks were not permitted to vote in municipal elections, there was heavy Black participation in Port Arthur at least as early as 1927, and maybe much earlier.

52. The Black citizens have participated substantially in municipal and civic affairs in Port Arthur from its inception.

53. In 1921, the first year women were enfranchised under the XIX Amendment to the United States Constitution, Black women voted in Port Arthur municipal elections.

54. No Black person has been denied the right to vote in Port Arthur municipal elections, at least since 1916, on account of race.

55. No literacy requirements or similar bar to participation by the Blacks has been imposed in any municipal election within Port Arthur.

56. Beginning in the 1920's, and continuing up at least until the late 1960's or early 1970's, when there were several candidates for office in an at-large election, the Black vote has been the "swing vote" in a number of city elections.

57. The Black vote, when it voted as a bloc, has allowed the Black citizens substantial voice in the political process because this vote has represented the "balance of power" between competing factions within the municipality.

58. In 1955, a Black person was elected to the city council of Port Arthur. At all times since 1955, there has been a Black person as a member of the city council of Port Arthur. Port Arthur was one of the very first cities in Texas to elect a Black person to its city council.

59. When the State Democratic Party would not recognize or seat them, Black persons were represented as delegates to the Jefferson County and State Democratic conventions from the City of Port Arthur.

VII. *MEXICAN–AMERICANS IN PORT ARTHUR*:

60. The Mexican-American represents approximately seven percent (7%) of the population of Port Arthur.

61. Historically, the Mexican-American residential community was somewhat concentrated in an area west of Houston Avenue and north of Sixteenth Street.

62. Since World War II the Mexican-American population has disseminated throughout the City of Port Arthur and is now dispersed throughout the City and has no particular concentration in any one locale.

63. Mexican-American citizens reside rather uniformly throughout the City and are in small but substantially equal numbers in the majority of voting precincts.

64. There are few, if any, Spanish-speaking persons in Port Arthur who do not also converse in the English language.

65. Those few, if any, Spanish-speaking persons in Port Arthur who do not also

speak English are generally persons of advanced years who reside with family members who are fluent in the English language.

66. While Texas has a history of discrimination toward Mexican-Americans (see *White v. Regester, supra*), such discrimination did not occur in Port Arthur.

67. The Mexican-American, by reason of his cultural, ethnic and language affinity, has a separate identity within Port Arthur.

68. The Mexican-American community has, within Port Arthur, oftentimes banded together to express its vote on issues and candidates within Port Arthur.

69. The creation of single-member city council wards in Port Arthur will effectively dilute the voice and vote of the Mexican-American citizens in Port Arthur because the numbers are so small and the citizens so dispersed geographically that they cannot play any effective role in the election of any candidate from single-member districts, whereas at-large they can constitute a substantial and effective vote as an ethnic bloc.

## PARTICIPATION

VIII. *POLITICAL EXPERIENCES UNDER PRESENT CHARTER*:

70. The system of election in Port Arthur, wherein each candidate must live in the district for which he or she is running, is very different from the at-large plans with no residency requirements.

71. Likewise, the impact upon minorities (Blacks, Browns and women) is also quite different.

72. The original purpose behind an election scheme like that in the City of Port Arthur is to allow the council member to bring both narrow (neighborhood) and broad (city-wide) perspectives into the decision-making process.

73. During the years 1970 through 1977, the City of Port Arthur has had a much higher voter turnout for its general elections than most United States cities.

74. The turnout of Black voters, and White voters, has been substantially the same.

75. The Black voter in Port Arthur has turned out in greater numbers than the White voters since 1975.

76. The Black persons have voted as a bloc since 1975, but this diminished substantially in both the mayor's election and the special election of 1977.

77. This bloc-voting power of the Black citizen is enhanced, rather than diminished, under the type of electoral system existing in Port Arthur.

78. Black turnout in special elections in Port Arthur has been only slightly lower than White turnout.

79. In the 1977 special election involving the consolidation of Pear Ridge, Lakeview and Port Arthur, Black turnout was, proportionately, only half that of White turnout.

80. In the 1977 special consolidation election, Blacks were nearly split in their support for consolidation, whereas Whites were almost unanimous in their support.

81. There was no racial polarization on the issue of consolidation in Port Arthur.

82. Until ninety percent of the Blacks vote one way, and ninety percent of the Whites vote another, racial polarization does not exist.

83. The electoral system itself, based upon election turnout data, does not appear to differ in its impact on Black participation as compared to White participation in elections.

84. There has been a long history of similarity in voting patterns between Black and White voters in Port Arthur. These voting patterns closely resemble each other until the year 1975.

85. Since 1975, racially polarized voting patterns are observable in city council elections.

86. Such racial polarization results largely from an incident involving a Black prisoner, Clifford Coleman, who was fatally injured while escaping from jail.

87. Minority candidacy rates have consistently been higher in Port Arthur than in most municipalities in the country.

88. Forty minority candidates offered themselves for public office in Port Arthur between 1955 and 1977.

89. This is particularly impressive in view of the fact it has been common since 1955 for Black citizens to stand for public office, at a time when few cities were even allowing Blacks to register to vote, let alone run for office.

90. There have been minority candidates for the various district seats between 1955 and 1977 as follows: For District 1, 14 times; for District 2, 3 times; for District 3, 3 times; for District 4, 1 time; for District 6, 3 times.

91. A comparison of candidacy patterns prior to the present at-large plan and after adoption of the present at-large plan in 1963 indicates that prior to 1963, the only Black candidacies actually occurred in the District 1 race.

92. Since 1963 there have been fewer incidences of Black candidates running against other Black candidates, serving to enhance the strength of the Black bloc vote, rather than to divide it.

IX. *BLACK PARTICIPATION IN THE PROCESS*:

93. Local government in Port Arthur consists, as a practical matter, not only of the elected city council, but of a multitude of appointed boards, committees, commissions, and other appointive agencies which have very substantial input into the decision-making process.

94. Black persons have been appointed by city council and have participated very effectively in the following committees, commissions, agencies, and the like:

(a) Aging Commission;

(b) Advisory Committee on tax-repossessed properties;

(c) Board of Adjustment and Appeals;

(d) Board of Equalization;

(e) City Housing Authority;

(f) Civil Service Commission;

(g) Parks and Recreation Board;

(h) Planning and Zoning Commission;

(i) Pleasure Island Commission;

(j) Port Arthur Landmark Committee;

(k) Urban Renewal Agency;

(*l*) Community Development Committee;

(m) Clean City Commission;

(n) Port Arthur Convention and Tourist Association Committee;

(o) Port Arthur Civic Center and Activity Center Commission

95. The election of city council members and mayor each two years insures continued accountability to the electorate.

*RESPONSIVENESS*

X. *FISCAL ACCOUNTABILITY*:

96. When the 1962 Charter change occurred and the present election system was instituted, the City of Port Arthur, as an entity, was in poor financial condition.

(a) The City had reportedly the highest tax rate in Texas.

(b) Municipal salaries and wages were comparatively very low.

(c) The capital needs of the City to replace an archaic plant were enormous.

(d) The City had undertaken an urban renewal project (R–7) which was on the brink of default, an occurrence which would have severely penalized the City for generations to come.

97. The financial condition of the City of Port Arthur in 1963, and the years following, substantially prevented the City's delivering more than the basic

services to any of its citizenry and effectively precluded the expansion of services.

98. Beginning in 1976 the City of Port Arthur has dramatically improved its financial condition, increased employee salaries, reduced its tax rates from $1.73 per hundred to $1.35 per hundred, and greatly enlarged its ability to provide municipal services.

99. The City of Port Arthur, since 1963, reorganized and successfully completed the urban renewal project (R–7) which was on the brink of default, and then developed and successfully completed another urban renewal project (R–93).

100. Both urban renewal projects R–7 and R–93 have materially improved conditions within two areas of the City wherein the majority of the residents are Black.

101. The successful completion of urban renewal projects R–7 and R–93 materially improved the quality of life and living conditions within the neighborhoods affected.

## XI. *CAPITAL EXPENDITURES*:

102. From October 1, 1963 through September 30, 1977, the City of Port Arthur has expended $40,599,983.00 on non-recurring capital expenditures.

103. From October 1, 1963 to September 30, 1977, the City of Port Arthur has spent approximately $31,281,702.00, or 77%, of its capital expenditures in census tract areas where, according to the 1970 census, minority population exceeds 50%.

## XII. *DECISION–MAKING PROCESS*:

104. The successful completion of urban renewal projects R–7 and R–93 materially improved the quality of life and living conditions.

105. Texas law insures open meetings of city council. The City of Port Arthur has scrupulously complied with the intent of the Texas Open Meetings Law. Both city council meetings and work sessions are accessible and open to the public.

106. Black participation in city council meetings and work sessions has been full and effective, reflecting no subtle discrimination or estrangement from the process of government of Black persons.

107. In Port Arthur major capital improvement projects such as the Civic Center, Library, and street improvements, are usually formulated by citizen committees and approved by the voters at large.

108. Salaries comprise 70% of the municipal budget. The balance of the budget expenditures is determined based on input from citizens' organizations, the Mayor, city council and staff.

109. Exceptional sources of City revenue such as general revenue sharing and federal grants involve citizen surveys at public hearings and citizen input at the neighborhood level.

## XIII. *COMPLAINT PROCESS*:

110. The City of Port Arthur has aggressively encouraged citizen input into its service provision functions.

111. The City has developed a "Complaint Process" and vigorously encouraged citizens to avail themselves of municipal services.

112. The City has a special telephone number for citizens to call and register complaints or seek assistance. This telephone number is advertised and is rather heavily utilized.

113. Citizens regularly list and register complaints through the telephone provided therefor, to the Mayor and his staff, to the elected council members, and to the City Manager.

114. A record of the complaint is made, the requested service is investigated, and if necessary, action is taken with respect thereto and a final report is made.

115. During the year June 30, 1977 through June 30, 1978, there were 360 citizen complaints registered and recorded.

Of that number, 190, or 52.77% of complaints received and acted upon by the City of Port Arthur came from persons living in areas where the minority population exceed 50%.

116. There is no evidence of racial discrimination regarding the provision of services within this complaint process.

## XIV. *EMPLOYMENT POLICIES AND PRACTICES:*

*Fire and Police:*

117. Article 1269m, Tex.Rev.Civ.Stat., governs the employment, promotion, and discipline of fire and police personnel in cities adopting the provisions of the Civil Service Act.

118. The City of Port Arthur, by vote of the citizens, adopted the provisions of Article 1269m in 1948.

119. The City has an entirely lawful non-discriminatory employment and promotion policy and practice with respect to fire and police personnel.

120. The City of Port Arthur has aggressively recruited fire and police personnel among Black persons.

121. The City has engaged professional Black recruiters and specifically recruited at predominantly Black colleges and universities.

122. The City has aggressively and innovatively adopted a screening procedure which encourages rather than discourages Black persons to apply for and be admitted to the Police Academy at Lamar University.

123. Once a police candidate has completed a course of study at the Lamar University Police Academy and passes an examination required for certification of police personnel by the State of Texas, such applicant is automatically eligible for employment by the City of Port Arthur.

124. The City has engaged the United States Civil Service Commission to validate its police and fire tests and examinations to make certain that same are occupationally relevant and do not contain any racial or cultural bias which will tend to discourage or eliminate Black persons from application, employment, and promotion.

125. There are presently 118 persons within the Police Department of the City of Port Arthur, 13 of whom are Black persons.

126. There are presently 101 persons within the Fire Department of the City of Port Arthur, 2 of whom are Black persons. Beginning in 1964 and continuing through 1977, the City has employed 5 Black persons as firemen, and presently has one Black fireman in the rank of lieutenant.

127. The lack of Black persons on the Fire Department staff is not attributable to either racial discrimination or indifference by City personnel, but rather a combination of factors beyond the control of the City.

128. For the past six years, Mr. Hamilton Joseph, a Black person, has served as one of three members of the City's Civil Service Commission and is a former chairman of such Commission.

129. The Civil Service Commission is the body charged by law with supervising and administering recruitment, employment promotion, and discipline of police and fire personnel.

*Non-Civil Service Employees:*

130. The City of Port Arthur, on July 17, 1972, adopted an Equal-Employment Opportunity Ordinance.

131. The City of Port Arthur has an Affirmative Action Plan for the employment and promotion of Black persons.

132. The City of Port Arthur has 667 employees.

133. The City of Port Arthur has 231 Black persons as permanent employees.

134. The City of Port Arthur has aggressively recruited and employed personnel without regard to race.

135. There is no evidence of racial discrimination in the recruitment, employment, promotion, and termination of personnel by the City.

136. The following factors reflect the City's continuing commitment to non-discriminatory employment practices:

    (a) There are a large number of Black persons employed by the City.

    (b) There are a large number of Black persons who apply for positions within the City who are local residents.

    (c) It is the policy of the City to employ local citizens when they are able and available for work.

    (d) It is the policy of the City to promote from within its own ranks of employees.

    (e) It is the policy of the City to provide each of its employees continuing formal education, including the cost of books, tuition and fees at local technical and academic colleges and schools.

137. The City has a substantial number of upper-level Black employees in the departments of public health, inspection, environmental and housing code enforcement, sewer, sanitation, finance, and the office of the mayor.

138. Within the standard metropolitan statistical area (SMSA) which includes Port Arthur, the percentage of Black persons within the available labor force is 20%.

139. Within the City of Port Arthur, including fire and police personnel, the percentage of Black employees is 35%.

140. The City of Port Arthur, as an employer, must compete with local industry for personnel.

141. Presently, the wage offerings of local industry exceed those of the City of Port Arthur at entry level jobs by 30%.

142. There is no evidence indicating the City of Port Arthur is other than an equal-opportunity employer who has a high percentage of Black employees who are recruited, employed, and promoted free from racial discrimination.

XV. *HOUSING*:

143. The City of Port Arthur adopted on September 3, 1974 an ordinance prohibiting discrimination in housing.

144. There is no segregation of housing within the City of Port Arthur.

145. The City has published ads in local newspapers advising citizens of its anti-discrimination housing ordinances and encouraging complaints be filed in the event of violation. Such advertisements were affirmatively run by the City of Port Arthur April 28, 1977, May 1, 1977, and February 17, 1978.

146. Since adoption of its ordinance prohibiting discrimination in housing, there has been but one complaint brought under such ordinance, which was resolved in favor of the complainant on March 1, 1977.

147. Black persons, and White persons, are diffused throughout the City of Port Arthur, although housing patterns reflect that there are residential neighborhoods of persons dominantly of one race.

XVI. *MINORITY BUSINESS RELATIONS*:

148. The City has vigorously and successfully encouraged minority-owned businesses to contract with the City.

149. Since 1975 a community development block program has expended $1,998,-239.00 in contracts. Of this, $432,-256.00 (21.6%) was awarded to minority-owned firms. Under Economic Development Administration funds, the City has awarded contracts totaling $932,168.00. $135,083.00 (14.49%) was awarded to minority-owned businesses.

XVII. *SERVICES TO BLACK RESIDENTIAL NEIGHBORHOODS*:

    *Water*:

150. All residential areas of the City have full municipal water services at the same uniform rates of service.

151. No Black residential neighborhood is without full municipal water service.

*Sanitary-Sewer* :

152. All residential areas of the City have full municipal sanitary-sewer service available at the same uniform rates of service, with the exception of about six homes in the Montrose area in the extreme northern reach of the City.

153. There is no discrimination in the provision of sanitary-sewer service or rates for service among the races.

154. The City has undertaken a $32,000,-000 sanitary-sewer improvement program which is necessary to bring its system into compliance with federal environmental regulations. This program commitment by the City is wholly free of racial discrimination and will insure service to each home and area of the City.

*Other Municipal Services* :

155. Full garbage, drainage, fire and police services are provided all residential areas of the City, without discrimination among the races in the provision of service or the rates therefor.

156. Health, park and recreation, and library services are fully provided by the City without discrimination among the races.

157. The City participates significantly in the provision of social services to the elderly, largely of low and moderate income means.

158. The provision of social services to the elderly, including the serving of meals, the provision of transportation, the engagement in daily activities, and employment is provided without racial discrimination.

159. Until 1970, the City of Port Arthur subsidized a private bus system operating within the City which was providing public transportation facilities for low and moderate income persons, largely of the Black race.

160. In 1970, the private transportation company withdrew its services from the City of Port Arthur.

161. Citizens requested the City of Port Arthur to provide public transportation facilities. In 1970, the lack of financial resources prevented the City's providing these services. In 1973, the City made application to the Department of Transportation and began developing a method of providing public transportation facilities. Beginning January, 1979, the City of Port Arthur will enter the area of public transportation and begin operating a public bus system.

162. The provision of public transportation facilities will largely benefit members of the Black race and will be provided without racial discrimination.

163. The City Hall in Port Arthur is an attractive public building used by many groups and organizations throughout the year.

164. The use of City Hall in Port Arthur is free to the citizens and citizen groups. A reservation system is maintained on a "first come-first served" basis. The use of the public building is completely free of racial discrimination.

*ENHANCING FACTORS*

165. The size of the City, both demographically and geographically, is such that campaigning city wide is done with relative ease and presents no burden or impediment to the candidate forcefully and effectively presenting his ideas to the voters.

166. Campaign cost in city-wide elections within Port Arthur are shown to be a rather nominal amount and do not in any way preclude effective presentation of qualifications and issues to the electorate.

167. Most elections within Port Arthur have involved only two candidates. Hence, the majority vote requirement within Port Arthur has practical similarity to plurality vote provisions in

larger communities and does not serve to stifle the expression of minority vote and opinion.

## CONCLUSIONS OF LAW

In accordance with the decisions of *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc) aff'd on other grounds sub nom. *East Carroll Parish School Bd. v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), *Kirksey v. Board of Supervisors of Hinds County*, 554 F.2d 139 (5th Cir. 1977); (en banc) cert. den'd 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977), *Nevett v. Sides*, 571 F.2d 209 (5th Cir. 1978), *Bolden v. City of Mobile*, 571 F.2d 238 (5th Cir. 1978), *Blacks United for Lasting Leadership, Inc. v. City of Shreveport*, 571 F.2d 248 (5th Cir. 1978), *Thomasville Branch of NAACP v. Thomas County*, 571 F.2d 257 (5th Cir. 1978), the Court has made particularized findings of fact. The Court has considered carefully the four primary factors and the enhancing factors that bear upon the determination of unconstitutional dilution which operates to minimize or cancel out the voting strength of racial or political elements within the voting population. In the aggregate, the evidence and findings lead the Court to conclude that the at-large election of Mayor and City Council in Port Arthur, Texas since 1963:

1. Has not cancelled, diluted or minimized the vote or voting strength of Negro citizens of the City;

2. Does not deny equal protection of the laws nor abridge any rights secured by the Fourteenth or Fifteenth Amendment to the United States Constitution;

3. Was not racially motivated in its origin nor is it racially motivated in its maintenance;

4. Has neither the purpose nor effect of depriving any person full access to, participation in and response from the city government and its processes;

5. Converting the City of Port Arthur to a single-member district of councilmanic election will have the effect of severely impinging the vote of the Mexican-American citizens in the City of Port Arthur, Texas.

Any finding of fact which constitutes a conclusion of law shall be deemed a conclusion of law and any conclusion of law which constitutes a finding of fact shall be deemed a finding of fact.

Judgment shall issue accordingly.

## FINAL JUDGMENT

The action came on for trial before the Court, the Honorable William M. Steger, District Judge, presiding, and based upon the Findings of Fact and Conclusions of Law that the existing at-large method of councilmanic election in the City of Port Arthur, Texas, does not contravene the rights of any person or group of persons under the XIVth or XVth Amendments to the Constitution of the United States and it is ORDERED, ADJUDGED and DECREED that plaintiffs shall take nothing by reason of Count One of their Complaint herein.

## ORDER ON MOTION TO "SET ASIDE" ELECTION

On November 28, 1978 there came on to be heard and considered the motion of plaintiffs "to set aside election" held in the City of Port Arthur, Texas, on April 1, 1978, wherein the following propositions were submitted to the electorate:

(a) Shall the City Council of the City of Port Arthur be authorized to sell, and by proper instrument in writing, convey to such person, or persons whom the City Council deems advisable, and upon such terms and conditions as said City Council may deem advisable and proper, certain property being more particularly described as follows: All that tract of land commonly known as Pleasure Islet.

(b) Shall the City Council of the City of Port Arthur be authorized to convey to the Lamar University at Port Ar-

thur, upon such terms and conditions as the City Council in its discretion may determine, certain property commonly known as Gates Memorial Library, being a tract of land containing approximately 1.72 acres, bounded by the westerly line of Stilwell Boulevard from the Southerly line of Procter Street to the Northerly Line of Lakeshore Drive, by the Northerly line of Lakeshore Drive from the Westerly line of Stilwell Boulevard to the Easterly boundary line of Lions Park, by the Easterly boundary line of Lions Park from the Northerly line of Lakeshore Drive to the Southerly line of Procter Street, and by the Southerly line of Procter Street, from the Easterly boundary line of Lions Park to the Westerly line of Stilwell Boulevard.

Having determined that a majority of persons voting in said election voted "for" each of said propositions; that balloting was conducted throughout the City of Port Arthur, including the areas of the former cities of Pear Ridge and Lakeview; that separate voting boxes were operated in the former Town of Lakeview, and in the former City of Pear Ridge; that each proposition carried by a majority vote in each voting box provided in the City of Port Arthur as same existed, both before consolidation and after consolidation with the former municipalities of Pear Rige and Lakeview; and that the referendum election of April 1, 1978 involving the two propositions quoted above, based upon consolidation of Port Arthur, Pear Ridge and Lakeview, was not the product of a change in "voting qualification or prerequisite to voting" within the meaning of Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. It is, therefore

ORDERED that plaintiffs' application to declare void said election is in all things DENIED and the passage of each proposition is hereby CONFIRMED.